Carl Walter **AIKEN**

v.

**UNITED STATES of America.**

No. C-2-G-60.

United States District Court
M. D. North Carolina,
Greensboro Division.

Feb. 1, 1961.

John V. Hunter III (court-appointed counsel), Greensboro, N. C., for movant.

James E. Holshouser, U. S. Atty., Greensboro, N. C., for respondent.

EDWIN M. STANLEY, District Judge.

Carl Walter Aiken, a defendant in Criminal Nos. 118–G–58, 119–G–58, 120–G–58 and 157–WS–58, has moved under Section 2255 of Title 28 U.S.C.A., to vacate and set aside the judgments and sentences imposed on April 18, 1958, on the alleged ground that he did not intelligently and effectively waive his right to representation by counsel, and that his pleas of guilty were accepted without first determining that the pleas were voluntarily made with understanding of the nature of the charges pending against him. The movant is hereinafter referred to as "defendant."

The defendant was brought before the court for a hearing on November 15, 1960. In advance of the hearing, John V. Hunter III, Esquire, a prominent member of the Greensboro Bar, was appointed to represent the defendant. Mr. Hunter made a trip to the United States Penitentiary at Atlanta, Georgia, the prison where the defendant was confined, for a conference with the defendant in advance of the hearing, and later conferred with him in the local jail after he was returned to Greensboro for the hearing.

After considering the motion and affidavits filed by the defendant, the evidence adduced at the hearing, and briefs and oral arguments of counsel, the court now makes and files herein its Findings of Fact and Conclusions of Law, as follows:

1. The defendant was arrested in Yadkin County, North Carolina, at about 8:30 p. m. on January 21, 1958, by Postal Inspector Robert Fisher on warrants

charging the burglary of the United States Post Office at Arrarat, Virginia, and the passing of a stolen money order in the District of Columbia. At the time of his arrest, defendant was in possession of a stolen automobile and numerous postal money orders that had been stolen from the Arrarat, Virginia, Post Office. Defendant was promptly taken before the United States Commissioner in Winston-Salem North Carolina, for a hearing. After being advised of his constitutional rights, defendant waived hearing before the commissioner and was placed in jail in default of bond.

2. The following morning, January 22, 1958, Postal Inspector S. G. Orvell arrived from Washington, D. C., to assist in the investigation. After the arrival of Inspector Orvell, he and Inspector Fisher went to the Forsyth County jail to interview defendant. Before asking any questions, Inspector Fisher fully advised defendant of his constitutional rights, including the right to have a lawyer during the interview, the fact that he did not have to make any statement, and that any statement he might make could be used against him in a criminal proceeding. Defendant refused to discuss the charges pending against him or to make any statement to the inspectors.

3. On the afternoon of January 22, 1958, the inspectors returned to the Forsyth County jail and showed to defendant the opinion of a Government document analyst indicating that, in the opinion of the analyst, defendant had forged a great number of money orders that had been stolen from the Arrarat, Virginia, Post Office. After seeing the opinion of the document analyst, the defendant gave the inspectors a lengthy statement admitting the burglary of the Arrarat, Virginia, Post Office, the forgery and passing of some 141 stolen money orders in several states, and the interstate transportation of a stolen motor vehicle. During the course of the interview, defendant was advised that there would undoubtedly be many warrants charging the forgery and passing of stolen money

orders, other than the warrant then in the possession of the inspectors charging the passing of a forged money order in the District of Columbia. The defendant thereupon voluntarily stated that, if possible, he would like to have all the charges disposed of in this district rather than having to stand trial in several districts. The provision of Rule 20 of Federal Rules of Criminal Procedure, 18 U.S.C.A., was then explained by the inspectors. During the course of the explanation, the defendant laughed and said, "I know all about it [Rule 20 transfers]; I've been in court before." The defendant then made inquiry of the inspectors as to the maximum penalty for burglarizing a post office, and was advised by the inspectors that the maximum penalty for this offense was five years. There was no discussion of any nature concerning the penalty for any other offense.

4. The following morning, January 23, 1958, the postal inspectors again visited the defendant at the Forsyth County jail and presented to him, in written form, the statement he had made the previous day. After carefully reading the statement, defendant initialed each page and signed same in the form of an affidavit. There was no further conversation with the defendant concerning Rule 20 transfers or the maximum penalty for any of the offenses referred to in the warrants or his written statement.

5. Shortly after defendant signed the statement on January 23, 1958, Inspector Orvell left North Carolina and returned to the District of Columbia, and did not see defendant again until the time he was tried on April 18, 1958. Inspector Fisher interviewed the defendant on one or two occasions, but only discussed the details of the forgery and the passing of postal money orders in other districts. There was no discussion with the defendant by either Inspector Orvell or Inspector Fisher after January 22, 1958, concerning Rule 20 transfers, maximum penalties for any of the offenses, or related subjects.

6. The only discussion either of the postal inspectors have ever had with defendant concerning representation by an attorney was to ask him in advance of the interview on January 22, 1958, if he had an attorney, and to advise him in advance of each interview that he had the right to consult an attorney before making any statement.

7. On January 24, 1958, Special Agent Carmon J. Stuart, of the Federal Bureau of Investigation, after having been told by Inspector Fisher that the defendant had admitted the interstate transportation of a stolen motor vehicle, went to the Forsyth County jail and interviewed the defendant concerning this offense. It is conceded that Special Agent Stuart fully advised defendant of all his constitutional rights before the interview and that no discussion took place at that time concerning Rule 20 transfers, the penalty for any offense with which the defendant might be charged, the advisability of having an attorney at his trial, or any other similar matter.

8. Upon the occasion of each of the aforementioned interviews on January 22, 23 and 24, 1958, the defendant appeared to be very intelligent and alert.

9. At the time the defendant was interviewed on January 22 and 23, 1958, the postal inspectors did not know of any outstanding charges against the defendant in any district, other than the charges referred to in the warrants charging the burglary of the post office at Arrarat, Virginia, and the passing of forged postal money order in the District of Columbia.

10. Since the defendant had stated orally to the postal inspectors that he would like to have all charges against him transferred to and heard in this district, and had incorporated such request in his written statement, the United States Attorney for this District later wrote the defendant at the Forsyth County jail making inquiry as to whether or not he desired certain other charges transferred to and disposed of in this

district. The defendant replied to this letter and advised that he would like to have charges pending against him in other districts transferred to this district for plea and sentence under Rule 20.

11. The defendant was later furnished with a copy of each of the following indictments pending against him in this and other districts:

(a) Criminal No. 118-G-58—A three-count indictment returned in the United States District Court for the Southern District of Florida, charging the passing of a number of falsely made and forged postal money orders.

(b) Criminal No. 119-G-58—A ten-count indictment returned in the United States District Court for the District of Columbia, charging the passing of a number of falsely made and forged postal money orders.

(c) Criminal No. 120-G-58—A three-count indictment returned in the United States District Court for the Western District of Virginia, charging the defendant with breaking into the post office at Arrarat, Virginia, with intent to commit larceny, the taking from said post office articles and property of the value in excess of one hundred dollars, and the interstate transportation of certain stamps and money orders stolen from the Arrarat, Virginia, Post Office.

(d) Criminal No. 157-WS-58—A one-count indictment returned in the United States District Court for the Middle District of North Carolina, charging the interstate transportation of a stolen motor vehicle.

12. At the time the postal inspectors interviewed the defendant on January 22 and January 23, 1958, the warrant in their possession relating to the passing of forged money orders in the District of Columbia only referred to one money order, and the warrant relating to the burglary of the Arrarat, Virginia, Post Office only referred to breaking into the post office with intent to commit larceny and the stealing of postal money order forms.

13. On April 1, 1958, the defendant signed and filed with this court three separate forms consenting to transfer the indictments pending in the Southern District of Florida, the District of Columbia, and the Western District of Virginia, to this district for plea and sentence under Rule 20, Federal Rules of Criminal Procedure. In each of the consents, the defendant acknowledged that he had received and read a copy of the indictment, that he understood the nature of the charges stated therein, and that, having been advised of his constitutional rights, including the right to advice of counsel, he wished to plead guilty to the offense charged, to waive trial under the indictment in the districts where pending, and to consent to the disposition of the cases in the Middle District of North Carolina, where he was under arrest. The consents were witnessed by a deputy United States Marshal, and were subsequently approved by the United States Attorney for this district and the United States Attorney for each of the other three districts involved.

14. On April 18, 1958, the defendant was brought before the court for trial on the four indictments. At the opening of the trial, the defendant acknowledged that he had previously been furnished with a copy of the indictment in each of the four cases, and that he was familiar with the nature of the charges contained in each of the indictments. The court then informed the defendant that he was entitled as a matter of right to have an attorney to represent him and that the court would appoint an attorney to appear on his behalf if he desired the services of an attorney and was financially unable to employ one. The defendant acknowledged that he understood his right to representation by counsel, but stated he did not desire an attorney as he believed "the court would be fair without an attorney." Upon further questioning, the defendant stated that he was forty-three years of age, and again stated that it was entirely agreeable with him to dispose of the charges pending against him without the service of an attorney. In deference to the wishes of the defendant, no attorney was appointed to represent him.

15. The Government offered the testimony of Inspector Fisher, who gave a brief summary of the facts concerning the burglary of the Arrarat, Virginia, Post Office, and the passing of forged money orders in a number of states, and the testimony of Special Agent John Nicholson of the Federal Bureau of Investigation, who testified concerning the interstate transportation of the stolen motor vehicle and the criminal record of defendant. The defendant was given an opportunity to question each of the Government witnesses. He stated that he did not desire to ask any questions of Inspector Fisher, but did question Special Agent Nicholson concerning his criminal record.

16. It was established that defendant had an extensive criminal record, the last prison sentence being a five-year federal prison sentence imposed at Birmingham, Alabama, on February 18, 1954, on an interstate transportation of stolen motor vehicle charge. It was further brought out that the defendant had been conditionally released from the Federal Penitentiary in Atlanta, Georgia, on July 5, 1957, and that he could have about two and one-half years to still serve in that case for violating his parole.

17. After defendant stated he had no evidence to present, he was given an opportunity to make any statement he cared to make in mitigation of punishment. Thereupon, petitioner made the following statement:

"I know my record looks bad and all like that, I have brought all this trouble on myself and I want to get it behind me and I am not trying to use psychology on the Court by saying that because I, deep down in my heart, I really mean it. I am old enough now and I got to get a new start in life if I ever get out of here and I had no excuse for committing this crime. However, I didn't have any employment when I came out of the penitentiary waiting for me aft-

er being in there eight years and contacts that I had with friends that I worked for previous or people that I knew. I had lost them all by my being in there, being against rules and regulations I couldn't get in touch with them; and due to the fact that I have this, you might say, a little over three years already on my shoulders I would appreciate any leniency you can show, however, my records do not indicate I deserve it but in my heart I believe that I do because I am through with this kind of life. Everything I have ever done in my life I have been caught for it, I have never done anything and got by with it and I know if I don't soon get a chance one of these days I am going to be an old man and won't be able to make a living if I don't get straightened out and settle down and go to work and get started before I do get too old, and I would appreciate it if you would take the time that I have served and the time that I already have to serve into consideration in imposing sentence and give me an opportunity before I am too old to get re-established in life. I would appreciate it."

18. Twelve-year concurrent prison sentences were then imposed in Criminal No. 118–G–58, Criminal No. 119–G–58 and Criminal No. 120–G–58, and a five-year concurrent prison sentence was imposed in Criminal No. 157–WS–58.

19. After the imposition of sentence, the defendant made the following statement:

"Your Honor, due to the fact that I have three and a half years in addition to this, I don't want you to think I am imposing on the Court, but would you consider cutting that two years and making mine ten and that will give me almost fourteen years?"

20. No change was made in the twelve-year sentence and the defendant was delivered to the custody of the United States Marshal to commence the service of his sentence, which he is now serving.

21. One Joseph Garland Witt was a co-defendant in Criminal No. 118–G–58, Criminal No. 119–G–58 and Criminal No. 120–G–58. Witt also consented to a Rule 20 transfer of these cases to this district, waived the appointment of counsel and entered a plea of guilty to each of the indictments. He is now serving a ten-year prison sentence on these charges, and has filed no motion or petition of any character.

22. Following the trial, Inspector Fisher communicated with the United States Attorney for each of the other districts where the defendant had confessed forging and passing stolen postal money orders, and advised of the disposition of the cases in this district. These communications resulted in charges pending in those districts being dismissed.

23. The court next heard from the defendant on January 4, 1960, when he filed a motion to vacate and set aside his sentence under Section 2255 of Title 28 U.S.C.A. The motion consisted mainly of conclusory statements, but it can fairly be said that the defendant claimed only that he was denied the assistance of counsel and that Government agents had told him "not to be surprised if the judge gave five years" on all the charges "because he had a previous record." The motion was denied without hearing by order dated February 4, 1960.

24. Defendant was permitted to appeal in forma pauperis, and while the appeal was pending, court-appointed counsel was permitted to file in the Court of Appeals an affidavit making serious accusations against the postal inspectors. None of these accusations appeared in the original petition filed with this court. The case was remanded for the purpose of resolving at a hearing the significant issues of fact presented by the petition and affidavit. The affidavit appears as an appendix to the opinion of the Court of Appeals. Aiken v. United States, 4 Cir., 1960, 282 F.2d 215.

25. At the hearing on November 15, 1960, defendant testified in his own behalf, but offered no further evidence. The Government offered the evidence of Postal Inspectors Orvell and Fisher and the testimony of Special Agent Stuart.

26. Neither of the postal inspectors, nor any other agent or employee of the United States Government, has ever advised defendant, directly or indirectly, not to retain or consult an attorney, or to waive the appointment of an attorney at his trial, or that if he would consent to Rule 20 transfers all charges would be consolidated and he would receive a maximum sentence of only five years, and the testimony of the defendant to the contrary is rejected.

27. Defendant was 43 years of age at the time of his trial, and is a person of superior intelligence.

### Discussion

While the affidavit filed by the defendant in the Court of Appeals and the testimony he gave at the hearing are not entirely consistent, it can fairly be said that the principal complaints of the defendant are that Postal Inspectors Fisher and Orvell, as an inducement to obtain a written confession, and after conferring with him some six times over a period of four days, promised that if he would consent to Rule 20 transfers of all charges against him, the charges would all be consolidated into one charge and that he would receive a maximum sentence of only five years, the maximum penalty for burglarizing the Arrarat, Virginia, Post Office; that the postal inspectors told him that it would be much better for him to plead guilty under Rule 20 and face only one charge than it would to stand trial in several districts on a number of charges; that the postal inspectors represented that they had already conferred with the Judge and the United States Attorney, and that the conversations had resulted in their being given a free hand in the matter; that the postal inspectors further represented that an attorney could "queer the entire deal" and that he should refuse the ap-

pointment of counsel and talk to the Judge himself; that the Judge was a fair-minded person and would prefer hearing his "side of the case in person rather than from an attorney"; and that, relying upon what the postal inspectors had told him, and following their suggestions, he made a "clean breast of everything," consented to the Rule 20 transfers, entered a plea of guilty to all charges, and waived the appointment of counsel, believing that a maximum sentence of five years would be imposed in all the cases. The defendant concedes, however, that he was furnished with copies of each of the four indictments about three weeks before his trial; that he had read each of the indictments and knew the contents thereof; that he was familiar with the nature of the charges contained in each of the indictments at the time he was called upon to enter his plea; that at the time of the trial he fully understood his right to the assistance of counsel, and fully understood that the court would appoint an attorney to represent him if he desired, but that he declined the appointment of counsel, and that he was given an opportunity to question the witnesses who testified against him, to offer evidence, and make any statement he desired in mitigation of punishment.

▮▮▮ In view of the foregoing, it would appear that determination of whether any of defendant's constitutional rights have been infringed would depend upon whether his testimony is worthy of belief. In other words, if the postal inspectors did not make the representations complained of, then it would follow that the defendant understood the nature of the charges against him, and understood his right to the assistance of counsel. It would further follow that he intelligently and effectively waived his right to the assistance of counsel, and that his plea of guilty to each of the indictments was voluntarily made.

Unquestionably, the burden is on the defendant to prove by a preponderance of the evidence that he has been deprived of some constitutional right in connection

with his guilty pleas which resulted in the judgment sought to be vacated, and that he must prove facts which would entitle him to the relief sought. United States v. Hoyland, 7 Cir., 1959, 264 F.2d 346; Bayken v. United States, 6 Cir., 1959, 272 F.2d 186; Starks v. United States, 4 Cir., 1959, 264 F.2d 797; Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461; Miller v. United States, 4 Cir., 1958, 261 F.2d 546. Additionally, when collaterally attacked, the judgment of a court carries with it a presumption of regularity. Johnson v. Zerbst, supra.

This court cannot accept as credible the assertions of the defendant that he had been promised, as an inducement to transfer three of his cases under Rule 20, enter pleas of guilty, and waive his right to assistance of counsel, that he would receive a maximum sentence of not more than five years on indictments that carried maximum penalties of 85 years. Such assertions, unsupported by any corroboration, were made for the first time almost two years after the defendant was tried and sentenced. While motions under 28 U.S.C. § 2255 may be made at any time, the lapse of time affects the good faith and credibility of the moving party. United States v. Wiggins, D.C.1960, 184 F.Supp. 673.

Had there been any merit to his contentions, the defendant would undoubtedly have protested his sentence when it was imposed. When asked at the hearing why he had not brought his present contentions to the attention of the court after he had received a twelve-year prison sentence, his only excuse was that "I didn't know I had a right to bring it to the attention of the court. I didn't know whether it would be right or would be wrong. I just didn't know." When asked why he had waited almost two years to make the accusations against the postal inspectors, the defendant's reply was:

"Well, when I went to the penitentiary, I didn't have a dime. I was dead broke. I had to work six months on a job before I could get on a paying job, that would pay me. After six months, after I went to work, I started ordering cases from West Publishing Company, cases I had dug up out of the library. It just took me that long to get prepared for it, to get the material together."

The defendant did not question any of the Government witnesses at the time of his trial concerning the charges in any of the indictments or their testimony, and declined to testify himself. His explanations for not bringing the alleged representations made by the postal inspectors to the attention of the court, particularly viewed in light of the statements that were made in mitigation of punishment, both before and after the imposition of sentence, and for waiting almost two years to file his motion, are completely incredible.

The age, background, experience and intelligence of defendants are factors to be considered in motions of this type. Starks v. United States, 4 Cir., 1959, 264 F.2d 797. The defendant Aiken was 43 years of age at the time of his trial. He impressed the court as being a person of superior intelligence. The same impression was made upon the postal inspectors at the time of the interviews on January 22 and 23, 1958. The defendant has had considerable experience in court proceedings, having served several prison sentences, the latest being a five-year sentence for transporting a stolen automobile in interstate commerce. His prison record dates back to 1936, and he has been convicted of such offenses as larceny of automobiles, forgery, false pretense and passing worthless checks.

Postal Inspector Fisher has been known to this court for several years, and there has never been an occasion to doubt or question his character or integrity in the slightest. While not personally acquainted with Postal Inspector Orvell prior to the hearing on November 15, 1960, there is no reason to doubt his honesty or integrity, and no reason to question his testimony. The testimony

of both postal inspectors completely refutes the assertion of the defendant. No suggestion is made that any other Government agent or employee ever made any representations to the defendant.

Another significant factor is that neither of the postal inspectors knew of the existence of the charges in the Southern District of Florida, or the interstate transportation of stolen motor vehicle charge in this district, at the time they interviewed the defendant and took his sworn confession. This completely refutes the assertion that any representation could have been made to the defendant concerning these charges.

It is true that at the time of defendant's arraignment the indictments were not read or explained in open court, and that the meticulous inquiry suggested by many of the decisions to determine the voluntariness of the pleas and waiver of counsel was not made. This doubtless accounts for the filing of the petition and serves to emphasize the importance of the admonition of the Court of Appeals for this circuit in Starks v. United States, 4 Cir., 1959, 264 F.2d 797. While it is the preferable practice to make a detailed inquiry at the time of arraignment, and have same made a part of the record, which practice is now being followed by this court, it is well established that the voluntariness of the plea and waiver of counsel can be established at the hearing on the motion to vacate as well as at the time of arraignment. Starks v. United States, supra; Gundlach v. United States, 4 Cir., 1958, 262 F.2d 72.

If this court entertained the slightest doubt as to the voluntariness of defendant's pleas of guilty, or the intelligence of his waiver of right to the assistance of counsel, the judgments would be vacated and set aside and new trials ordered. The fundamental right to the assistance of counsel should not be lightly regarded. However, it is a right that can be waived. Spevak v. United States, 4 Cir., 158 F.2d 594, certiorari denied 1947, 330 U.S. 821, 67 S.Ct. 771, 91 L. Ed. 1272.

It is concluded that no assurances were given by the postal inspectors, or any other Government agent or employee, to induce the defendant to execute the consents to transfer his cases to this district for plea and sentence under Rule 20, enter pleas of guilty to the indictments, or to waive his right to the assistance of counsel. It is further concluded that the pleas of guilty were voluntarily made with understanding of the nature of the charges contained in each of the indictments, and that the right to the assistance of counsel was intelligently waived.

### Conclusions of Law

1. The defendant has failed to establish that any of his constitutional rights have been infringed.

2. The motion to vacate and set aside the judgment should be denied.